IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUDITH WILSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CHECKERS DRIVE-IN | : | NO. 12-5365 |
| RESTAURANTS, INC. | : | |

**MEMORANDUM**

**Padova, J.**                                                                                                   **May 22, 2013**

Plaintiff Judith Wilson has brought this action against Defendant Checkers Drive-In Restaurants, Inc. ("Checkers"), asserting claims for sexual harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951 et seq. ("PHRA"). Before the Court is Checkers' Motion for Summary Judgment. For the following reasons, we deny the Motion.

**I.      BACKGROUND**[1]

Plaintiff, a thirty-nine year old female, began working as a crew member at Checkers' 2329-49 N. 29th Street location (the "Restaurant") on October 9, 2011. (First Am. Compl. ("FAC") ¶¶ 10-11; Pl.'s Dep. at 94, 224.) The Restaurant employs approximately twenty crew members. (Segovia Dep. at 12.) Plaintiff's responsibilities as a crew member included preparing food on the grill and operating the cash register. (Pl.'s Dep. at 102-03.) Keathel Haynes, a male, was the general manager of the Restaurant while Plaintiff worked there. (Id. at 95; Segovia Dep. at 13-14.) As the general manager, Haynes was responsible for hiring, firing, and scheduling the employees of the Restaurant. (Segovia Dep. at 15-16.)

---

[1] We must view "the facts and draw all reasonable inferences in the light most favorable to the plaintiff," as she is the nonmoving party, and thus, we have drawn our summary of the facts primarily from Plaintiff's deposition. Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)).

Plaintiff worked at the Restaurant from October 9, 2011 until November 20, 2011. (Pl.'s Dep. at 94, 103.) During that time, Plaintiff worked shifts on eleven days for a total of approximately 40 hours. (Pl.'s Ex. D.) Plaintiff worked directly with Haynes during five of those shifts for a total of approximately twelve hours. (Pl.'s Dep. at 167-68.) Although Haynes maintained and posted a weekly schedule for his employees at the Restaurant, he did not schedule Plaintiff for shifts on the employee schedule. (Id. at 107.) Instead, to find out when she was scheduled to work, Plaintiff would call Haynes to see if she could "get some time," or Haynes would call her in to work. (Id. at 105.)

The first time that Plaintiff worked a shift with Haynes, he placed her hand on his genitals while she was undergoing computer training. (Id. at 162-63.) Over time, Haynes's conduct towards Plaintiff became "more aggressive." (Id. at 283.) During one night shift, Haynes whispered in Plaintiff's ear that she was "sexy" and told her, using crass and explicit language, that he sexually desired her. (Id. at 165.) On another occasion, Haynes graphically described to Plaintiff one of his sexual fantasies involving her, detailing precisely what he wanted to do to her and how he dreamed she would react. (Id.) At other times, Haynes made sure that he physically touched Plaintiff while he passed her, rubbed his genitals against her, and pulled her close to his body. (Id. at 77, 164, 283.) Haynes also made sexually explicit remarks when they spoke on the phone about her work schedule. (Id. at 106, 226.) Plaintiff rejected Haynes's sexual advances and told him to stop each time that he acted inappropriately. (Id. at 246-47, 283.)

On November 20, 2011, the last day that Plaintiff worked at the Restaurant, Plaintiff clocked in at 8:05 a.m. (Id. at 158.) At some point before noon, Haynes followed Plaintiff into

2

the freezer area, where there are no cameras. (Id. at 71, 76.) While in the freezer, Haynes touched Plaintiff's breasts, grabbed her between the legs, tried to kiss her, exposed his genitals, and invited her to perform oral sex on him. (Id. at 71.) Plaintiff told Haynes to stop and to get away from her, and she even hit Haynes in an effort to get away. (Id. at 71, 218.) Haynes responded that her reaction "turned him on." (Id. at 247.) No one else witnessed Haynes's conduct that day, and when another employee came into work a few hours later, Haynes ceased acting inappropriately. (Id. at 159.)

Plaintiff left the Restaurant at 12:50 p.m. for lunch, returned at 1:48 p.m., and finished her shift at 3:54 p.m. (Id. at 159-60; Pl.'s Ex. D.) Haynes left the Restaurant at 3:00 p.m., almost one hour before Plaintiff's shift ended. (Pl.'s Dep. at 160.) Later that day, Plaintiff called Haynes to ask about her schedule, and he told her that "when you give me some pussy, you get some time." (Id. at 104-05.) Plaintiff went to the restaurant on the following two days, November 21 and 22, checked the employee schedule, and learned that she was not scheduled for any shifts on those two days. (Id. at 105, 131-34.) Another employee told Plaintiff to call Haynes about the schedule, but she never called him. (Id. at 134.) Plaintiff did not work again at the Restaurant. (Id. at 103.)

Checkers maintains a toll free telephone number (the "Employee Hotline") for employees to report any workplace issue. (Morgan Decl. ¶ 5.) On November 29, 2011, Plaintiff called the Employee Hotline to report that Haynes was sexually harassing her. (Pl.'s Dep. at 117-18, 121-22.) Checkers initiated an investigation into Plaintiff's complaint, and District Manager David Lintz called Plaintiff back within twenty four hours of her call. (Lintz Decl. ¶¶ 6-7.) However, Plaintiff refused to speak to Lintz, told him to contact her attorney, and hung up the phone. (Id. ¶

3

8; Pl.'s Dep. at 141, 144.) Lintz called Director of Employee Relations Jay Morgan, advised Morgan of his inability to obtain Plaintiff's cooperation, and gave him the contact information for Plaintiff's attorney. (Lintz Decl. ¶ 9.) Morgan left messages for Plaintiff's attorney on two occasions, but never received a return phone call. (Morgan Decl. ¶ 7; Ex. 1 to Morgan Decl.)

On December 15, 2011, Lintz and Regional Manager Eduardo Segovia interviewed Haynes. (Segovia Decl. ¶¶ 3, 12.) During the interview, Haynes denied engaging in the conduct that Plaintiff alleged in her Employee Hotline complaint, but admitted that he and Plaintiff had a consensual sexual relationship. (Id. ¶ 13; Lintz Decl. ¶ 10.) Checkers maintains a policy governing "closer than normal relationships" between supervisors and subordinates. (Segovia Decl. ¶ 14.) According to that policy, a supervisor who becomes involved in a relationship with a subordinate must report that relationship to Checkers or be subject to termination. (Id.) Haynes's purported relationship with Plaintiff violated Checkers' policy. (Id. ¶ 15.) Segovia and Lintz immediately placed Haynes on administrative leave and terminated him soon thereafter without allowing him to return to work for Checkers. (Id. ¶ 15; Lintz Decl. ¶ 11.)

The First Amended Complaint alleges that Plaintiff was subjected to sexual harassment and retaliation for refusing Haynes's advances and for complaining of his sexual harassment, in violation of Title VII and the PHRA. (FAC ¶¶ 21, 25.) Checkers has moved for summary judgment as to each of Plaintiff's claims.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict

4

for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

In evaluating the evidence, we take the facts "in the light most favorable" to the nonmoving party and "draw all reasonable inferences" in her favor. Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000) (citation omitted), aff'd, 29 F. App'x 100 (3d Cir. 2002). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. AEV,

5

Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).

## III. DISCUSSION

Plaintiff has brought her claims pursuant to Title VII and the PHRA. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The PHRA similarly makes it unlawful for any employer to discharge or otherwise discriminate against an employee based on that employee's "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability. . . ." 43 Pa. Stat. § 955(a).

We analyze claims brought pursuant to Title VII and the PHRA under the same standard. Atkinson v. LaFayette Coll., 460 F.3d 447, 454 n.6 (3d Cir. 2006) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)). Plaintiff's claims fall into two groups: (1) claims of sexual harassment, brought pursuant to Title VII and the PHRA; and (2) claims that she was denied hours and fired in retaliation for her complaints of sexual harassment, brought pursuant to Title VII and the PHRA.

### A. Sexual Harassment

The First Amended Complaint alleges that Plaintiff was subjected to quid pro quo sexual harassment in violation of Title VII and the PHRA.[2] (FAC ¶¶ 21, 25.) Because Plaintiff does

---

[2]Although the First Amended Complaint also asserts hostile work environment claims under Title VII and the PHRA, Plaintiff has voluntarily withdrawn those claims. The distinction between quid pro quo and hostile work environment claims is that "[w]hen there is a tangible

6

not have direct evidence of discrimination, her quid pro quo sexual harassment claim should be analyzed pursuant to the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Ogilvie v. N. Valley EMS, Inc., Civ. A. No. 07-485, 2008 WL 4761717, at *8 (E.D. Pa. Oct. 29, 2008) (applying the McDonnell Douglas framework to the plaintiff's quid pro quo claim). "Under McDonnell Douglas, the plaintiff bears the initial burden of demonstrating a prima facie case of unlawful discrimination or retaliation." Dellapenna v. Tredyffrin/Easttown Sch. Dist., 449 F. App'x 209, 213 (3d Cir. 2011) (citing McDonnell Douglas, 411 U.S. at 802). To establish a prima facie case of quid pro quo sexual harassment, Plaintiff must establish that "'her response to unwelcome advances was subsequently used as a basis for a decision about compensation, [terms, conditions, or privileges of employment].'" Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281-82 (3d Cir. 2000) (alteration in original) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997)). In other words, Plaintiff must show that "'a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands.'" Ogilvie, 2008 WL 4761717, at *8 (quoting Ellerth, 524 U.S. at 753).

If Plaintiff succeeds in establishing a prima facie case of sexual harassment, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision." Dellapenna, 449 F. App'x at 213 (citing McDonnell Douglas, 411 U.S. at 802). If the

---

employment action, the claim is . . . known as a quid pro quo claim, and an employer is automatically liable for a supervisor's harassment." Fugarino v. Univ. Servs., 123 F. Supp. 2d 838, 842 n.2 (E.D. Pa. 2000) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765) (1998)). In contrast, a hostile work environment claim arises when no tangible employment action occurs, and to be actionable, "the harassment must be severe and pervasive, and an employer may avoid vicarious liability by successfully raising an affirmative defense." Id. (citing Ellerth, 524 U.S. at 765) (other citation omitted).

employer is able to meet its "'relatively light burden,'" then "the burden of production returns to the plaintiff, who can defeat summary judgment only by showing by a preponderance of the evidence that the employer's stated reason is pretextual." Id. (quoting and citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).

Checkers argues that it is entitled to summary judgment on Plaintiff's sexual harassment claim because she has not met her initial burden of demonstrating a prima facie case of quid pro quo sexual harassment. Checkers does not contest that Haynes's advances towards Plaintiff were unwelcome or that she refused his sexual demands. It argues, however, that Plaintiff was not subjected to any adverse tangible employment action. Plaintiff maintains that she was subjected to an adverse tangible employment action because Haynes fired her on November 20, 2011, and because he denied her hours based on her repeated rejection of his sexual advances.

    1.    <u>Termination</u>

Plaintiff maintains that she was subjected to an adverse employment action when Haynes fired her on November 20, 2011.[3] The evidence of record shows that Plaintiff's last day of work at the Restaurant was November 20, 2011, when she worked from 8:05 a.m. to 3:54 p.m. (Pl.'s Dep at 158, 160.) After her shift ended and she went home, she called Haynes and asked when she would be working again. (Id. at 104-05, 137.) As recounted more graphically above, Haynes essentially told her that when she gives in to his sexual demands, he would give her hours. (See id. at 105.) Plaintiff "thought" and "felt" that this comment meant that Haynes had terminated her. (Id. at 110, 136, 149, 287.) However, Plaintiff points to no other evidence, apart from her own interpretation of Haynes's comment, to show that her employment with Checkers

---

[3]Plaintiff does not proceed on a theory of constructive termination. (Pl.'s Mem. at 11.)

was actually terminated on November 20, 2011. To the contrary, Plaintiff concedes that neither Haynes nor any other Checkers employee ever told her that she was fired, either on November 20 or anytime thereafter. (Id. at 177, 184, 211.) Regional manager Eduardo Segovia testified that Plaintiff's employment with Checkers was never, in fact, terminated, and that Checkers attempted to contact Plaintiff after it learned of her allegations of sexual harassment, but she never returned to work. (Segovia Dep. at 43-44.) When Segovia checked the employee roster on December 15, 2011, almost a month after Plaintiff's last day of work, she was still listed as a Checkers employee. (Segovia Dep. at 29, 39.)

Plaintiff's professed belief that she was terminated as of November 20, 2011 is also belied by the actions that she took after that date. When asked what happened after her phone conversation with Haynes, Plaintiff responded: "Then that day went by. I'm like, okay, whatever. I went to the restaurant the next day." (Pl.'s Dep. at 132.) She returned to the Restaurant on November 21 and 22, the two days following Haynes's comment, to check if she was scheduled to work those days. (Id. at 131-34.) Plaintiff's action of returning to the Restaurant on November 21 and 22 is inconsistent with Plaintiff's claim that she "thought" or "believed" that Haynes had terminated her on November 20, 2011. In addition, when she called the Employee Hotline on November 29, 2011, she complained that Haynes was sexually harassing her, but did not report that she had, at any point, been terminated. (Id. at 149.) Based on all of this evidence in the record, we conclude that Plaintiff has failed to respond to Checkers' Motion with a sufficient factual showing from which a jury could conclude that she suffered an adverse tangible employment action based on her alleged termination on November 20, 2011.

2. Denial of Hours

Plaintiff also contends that even if she was not terminated on November 20, 2011, she was subjected to an adverse tangible employment action because Haynes denied her hours at the Restaurant. "If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 153 (3d Cir. 1999) (citation omitted). "A reduction of hours . . . would qualify as an adverse employment action as it could deprive that plaintiff of employment opportunities or affect her status as an employee." Mock v. Northampton Cnty. Sheriff's Dep't, Civ. A. No. 07-3607, 2008 WL 2996714, at *8 (E.D. Pa. Aug. 5, 2008).

As the manager of the Restaurant, Haynes was required to post an employee schedule on the premises. (Segovia Dep. at 52-53.) He was also required to schedule his employees for shifts, and list those shifts on the employee schedule. (Id. at 35, 37, 53.) Although Haynes posted an employee schedule at Restaurant, he never listed Plaintiff's shifts on the employee schedule while she worked there. (Id. at 34-35, 39-40.) Segovia testified that Haynes's failure to list Plaintiff's shifts on the employee schedule was not customary and was even possibly illegal. (Id. at 36.) Before Haynes was terminated, Segovia confronted him about his failure to schedule Plaintiff for shifts on the employee schedule:

> He never put her on the schedule and I – one of the things that I did question him was, you know, why is she not on the schedule? He claimed that she was not on the schedule because she was oncall. That's when, obviously, I got even more irate because I'm like when do we ever put anybody oncall? You hire somebody, an employee goes through the application process. She's put on the schedule. The schedule is supposed to be posted two weeks prior in advance. Like I said, after reviewing the schedule, we wanted to confront him for sure because he was

10

lying saying that he did put her on the schedule and she was never on the schedule.

(Id. at 35-36.)

When Plaintiff asked Haynes why she was never listed on the employee schedule, he responded that he was going to put her shifts on the employee schedule, but he never did so. (Pl.'s Dep. at 107.) Unlike the other employees whose shifts were listed on the employee schedule, Plaintiff would have to call Haynes, or he would call her, to get hours at the Restaurant. (Id. at 106-07.) Plaintiff reports that, during those phone conversations, Haynes would not advise her as to her next shift until she listened to his sexually explicit remarks:

> Then I have to listen to him: Oh, you know you're sexy. I just want to F you, and all these things. Like he'd call me at 2, 3 o'clock in the morning. I'm like, oh, my gosh, I'm like sleeping here. But these are the things I would have to go through with this man. What the hell? I'm just trying to work. All right, Mr. Keathel. Okay, sir. Well, Mr. Keathel, when can I come in? So I'd have to listen to his things, you know. Okay, Mr. Keathel. Yes, sir. When can I come in? And then he'll tell me, "Okay, come in tomorrow, you know, and you'll work a couple hours."

(Id. at 106.) When Haynes made these late night calls to Plaintiff, she "thought he was calling to give [her] time," but he soon made it clear that he was propositioning her. (Id. at 226.) Plaintiff testified that he said things such as, "I want to sex you" and "I want to come over." (Id.) He would describe what he wanted to do to her and suggest that only after complying would she "get [her] time." (Id.) Plaintiff explained that "[i]t's like he'll go through this whole sexual thing and then he'll be like, 'Come in tomorrow.'" (Id.) Plaintiff claims that she always told him to stop when he said inappropriate things to her, but did not know who else to turn to for help and needed to keep her job. (Id. at 217.)

Moreover, as noted above, on November 20, 2011, after the escalated encounter in the freezer area of the Restaurant, Plaintiff called Haynes to inquire about her work schedule, and he responded that when she gave into his sexual demands, she would "get some time." (Id. at 104-05.) Plaintiff testified that she was "not going to give him [what he asked for]. I don't have to sleep with [him] for a job. I get no time." (Id. at 133.) Plaintiff also reported to the Checkers Employee Hotline that she believed that she would not get any shifts unless she accepted Haynes's sexual advances. (Id. at 147-48.)

The record can thus support a reasonable conclusion that Haynes failed to schedule Plaintiff for shifts on the employee schedule despite Checkers' policy that obligated him to do so. Instead, Haynes informally offered Plaintiff hours only after she endured his sexual advances, and subsequently refused to give her any shifts on the employee schedule based on her rejection of his advances. We conclude that a jury could find, based on the evidence in the record and drawing all reasonable inferences in favor of Plaintiff, that Haynes's stated refusal to schedule Plaintiff for shifts on the employee schedule constituted a denial of hours, which "substantially decrease[d] [Plaintiff's] earning potential and cause[d] signification disruption in . . . her working conditions." Durham Life Ins. Co., 166 F.3d at 153 (citation omitted); see Cragle v. Werner Enters., Inc., Civ. A. No. 07-2132, 2010 WL 936774, at *8 (M.D. Pa. Mar. 11, 2010) (holding that the plaintiffs established a prima facie case of quid pro quo sexual harassment because there was evidence that the plaintiff's supervisor "limited the hours which plaintiffs could work" and "aimed those cuts specifically at the plaintiffs after they spurned his advances and complained about his conduct").

Therefore, viewing these facts in the light most favorable to Plaintiff, we conclude that Plaintiff has responded to the Motion with a factual showing from which a jury could conclude that she was subjected to an adverse tangible employment action, and she has therefore established a prima facie case of sexual harassment. Accordingly, we deny Checkers' Motion insofar as it seeks judgment in its favor on Plaintiff's claim that she was sexually harassed in violation of Title VII and the PHRA.

B. Retaliation

The First Amended Complaint alleges that Plaintiff was subjected to retaliation for her complaints of sexual harassment and for refusing Haynes's sexual advances, in violation of Title VII and the PHRA. (FAC ¶¶ 21, 25.) "In the absence of direct evidence of retaliation, retaliation claims . . . typically proceed under the McDonnell Douglas framework." Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005) (citations and footnotes omitted). To establish a prima facie case of retaliation, a plaintiff must show that: "(1) [s]he engaged in protected activity, (2) [her] employer took an adverse employment action against [her], and (3) there was a causal connection between [her] participation in the protected activity and the adverse employment action." Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010) (footnote omitted) (citing Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006)). "As with discrimination claims, if a plaintiff establishes a prima facie case, the employer must show a legitimate, non-discriminatory reason for the adverse action. The burden then shifts back to the plaintiff to demonstrate that the offered reason is pretextual." Warfield v. Se. Pa. Transp. Auth., 460 F. App'x 127, 131 (3d Cir. 2012) (citing Moore, 461 F.3d at 342).

Checkers argues that it is entitled to summary judgment on Plaintiff's retaliation claim because the record cannot support a conclusion that Plaintiff either engaged in a protected activity or was subjected to an adverse employment action in response to her involvement in a protected activity, and, thus, she cannot establish a prima facie case of retaliation. Plaintiff maintains that she has stated a prima facie case of retaliation because she was denied hours based on her complaints about Haynes's offensive conduct.[4]

1. Protected Activity

Checkers argues that Plaintiff has not established a prima facie case of retaliation because she has failed to point to evidence that she engaged in a protected activity. Protected activity includes "the filing of formal charges of discrimination and informal protests of discriminatory activities, such as making complaints to management." Warfield, 460 F. App'x at 131 (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)). Protected activity does not encompass "very generalized complaints about unfair treatment. At a minimum, the conduct must convey a protest of discriminatory practices such that it will be understood that a complaint about an unlawful employment practice has been advanced." Id. (citing Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)).

Plaintiff testified that every time that Haynes made sexual advances towards her, she refused his advances, told him to stop, and complained to him about his inappropriate conduct.

---

[4]The First Amended Complaint also alleges that Plaintiff was retaliated against for her November 29, 2011 Employee Hotline complaint. (FAC ¶ 17.) However, in her deposition, Plaintiff specifically denied that she was subjected to retaliation after making that complaint (Pl.'s Dep. at 253), and clearly states in her Memorandum that the November 29 complaint "is not the basis of her claim for retaliation." (Pl.'s Mem. at 11.) Therefore, we consider Plaintiff to have withdrawn her retaliation claim to the extent that it relies on an allegation that she was retaliated against as a result of her November 29 complaint.

(Pl.'s Dep. at 283.) In total, she complained to Haynes about his offensive conduct on at least five separate occasions. (Id.) We conclude that the record supports a conclusion that those complaints constituted protected activities because they "convey[ed] a protest of discriminatory practices" and because they were made in direct opposition to Haynes's sexually offensive conduct. Warfield, 460 F. App'x at 131 (citing Curay-Cramer, 450 F.3d at 135). Thus, it should have been understood by Haynes "that a complaint about an unlawful employment practice ha[d] been advanced." Id. (citing Curay-Cramer, 450 F.3d at 135); see also Hughes v. Texas Keg Steakhouse & Bar, Inc., Civ. A. No. 05-0061, 2006 WL 708158, at *4 (N.D. Tex. 2006) (finding that the plaintiff's complaints to her harassers "oppose[d] purported sexual harassment" and constituted protected activity). We therefore conclude that Plaintiff has pointed to record evidence from which a jury could conclude that she engaged in a protected activity by lodging complaints about Haynes's sexual harassment, and accordingly, Plaintiff has satisfied the first element of her prima facie case of retaliation.

2. Adverse Employment Action

Checkers also argues that Plaintiff has not established a prima facie case of retaliation because the record does not support a conclusion that she was subjected to an adverse employment action. An adverse employment action, for the purposes of a retaliation claim, is defined as an action that "a reasonable employee would have found [to be] materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). "'[P]etty slights, minor annoyances, and a simple lack of good manners' are normally not sufficient to

15

deter a reasonable person." Hare v. Potter, 220 F. App'x 120, 128 (3d Cir. 2007) (alteration in original) (quoting White, 548 U.S. at 68). "Determinations about whether acts are materially adverse or simply part of a normal workplace 'depend on the totality of the circumstances.'" Boandl v. Geithner, 752 F. Supp. 2d 540, 562 (E.D. Pa. 2010) (quoting Moore, 461 F.3d at 346).

Plaintiff maintains that Haynes denied her hours in response to her complaints about his sexual advances.[5] We have already found that there is record evidence that Haynes targeted Plaintiff for his sexual advances, that Plaintiff rejected those advances and complained to Haynes about his conduct, and that in response, Haynes failed to schedule Plaintiff for shifts on the employee schedule. A jury could therefore conclude, based on the evidence in the record and drawing all reasonable inferences in favor of Plaintiff, that Haynes's refusal to assign Plaintiff shifts on the employee schedule, which denied her hours, constituted a "materially adverse" employment action. White, 548 U.S. at 68 (quotation omitted). We therefore reject Checkers' argument that the record cannot support a conclusion that Plaintiff suffered an adverse employment action, and we conclude to the contrary that Plaintiff has sufficiently satisfied the second element of her prima facie case for retaliation.

### 3. Causal Connection

Checkers also argues that Plaintiff cannot establish a causal connection between any alleged adverse employment action and a protected activity. Plaintiff "may rely on a 'broad array of evidence' to demonstrate a causal link between [her] protected activity and the adverse action taken against [her]." Marra v. Phila. Housing Auth., 497 F.3d 286, 302 (3d Cir. 2007)

---

[5]Plaintiff also grounds her retaliation claims on her alleged termination on November 20, 2011. Because we have already found that the evidence of record does not support Plaintiff's allegation that she was actually terminated with respect to her sexual harassment claim, there is insufficient record evidence to support a retaliation claim based on that alleged termination.

(quoting Farrell, 206 F.3d at 284). Such evidence may include, *inter alia*, "an 'unduly suggestive' proximity in time between the protected activity and the adverse action," "actual antagonistic conduct or animus against the employee," or "the employer's treatment of other employees." Id. (quoting Robinson, 120 F.3d at 1302) (other citations omitted).

The evidence of record establishes that, despite Plaintiff's complaints about Haynes's offensive conduct, his sexual advances became "more aggressive" over time. (Pl.'s Dep. at 283.) Plaintiff also testified that, although Haynes posted an employee schedule at the Restaurant and listed shifts for his other employees on that schedule, Plaintiff was singled out to the extent that, unlike the other employees, she was never given shifts on the employee schedule. (Id. at 107; Segovia Dep. at 39-40.) Unlike the other employees, she had to call Haynes, or he would call her, to get hours at the Restaurant. (Pl.'s Dep. at 106-07.) Moreover, on November 20, 2011, Haynes expressly explained to Plaintiff that when she acceded to his sexual demands, he would give her shifts on the employee schedule. (Id. at 104-05.)

Given Haynes's unequivocal comment to Plaintiff that she would not get any hours as long as she continued to reject his sexual advances, his increasingly aggressive sexual behavior after she refused those advances, and his unequal treatment of Plaintiff compared to other employees, the record could support a reasonable conclusion that there was a causal connection between Plaintiff's complaints about Haynes's conduct and his refusal to schedule her for shifts on the employee schedule. Based on these facts, a jury could reasonably conclude that Haynes's actions were "caused by retaliatory animus." Moore, 461 F.3d at 346; see Marra, 497 F.3d at 303 (noting that "it matters not, of course, whether each piece of evidence . . . is alone sufficient to support an inference of causation, so long as the evidence permits such an inference when

considered collectively" (citation omitted)).  We thus conclude that the record can support the conclusion that Plaintiff has satisfied the third element of her prima facie case of retaliation.

Therefore, viewing the evidence in the light most favorable to Plaintiff, we conclude that Plaintiff has responded to the Motion with a factual showing sufficient to support a prima facie case of retaliation.  Accordingly, we deny Checkers' Motion with respect to Plaintiff's claim that she was subjected to retaliation in violation of Title VII and the PHRA.

## IV.	CONCLUSION

Checkers has moved for summary judgment based on its challenge to Plaintiff's prima facie cases of sexual harassment and retaliation.  Because we conclude that Plaintiff has satisfied her burden of pointing to record evidence to support her prima facie cases of sexual harassment and retaliation, we deny in its entirety Checkers' Motion for Summary Judgment.  An appropriate order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.